IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| B.N.S., A MINOR CHILD BY HER PARENTS AND NEXT FRIENDS CHRISTINE AND BRIAN STEWART, | * | |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| v. | | Case No. 17-cv-02670-ELH |
| | * | |
| VICTOR BRITO, CHIEF OF POLICE, HAGERSTOWN POLICE DEPARTMENT, ET AL., | * | |
| | * | |
| DEFENDANTS. | | |

\* \* \* \* \* \* \*

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR, ALTERNATIVELY,
FOR SUMMARY JUDGMENT**

Victor Brito, in his official capacity as Police Chief of the Hagerstown Police, the Hagerstown

City Police Department, in their official and personal capacities P.O Eichelberger, Sgt. Constable,

Officer Rowe, Bob Bruchey, in his official capacity as Mayor of the City of Hagerstown, the City of

Hagerstown, and in their official capacities as City Council Members of the City of Hagerstown, Kristin

B. Aleshire, Paul Corderman, Emily Keller, Lewis Metzner, and Donald Munson, Defendants, by their

undersigned counsel, pursuant to Local Rule 105.1, submit this Memorandum in support of their Motion

to Dismiss or, alternatively, for Summary Judgment.

## I.    Introduction

On September 11, 2017, Plaintiff, B.N.S., a minor child by her parents and next friends Christine

and Brian Stuart, filed suit, through counsel, in this Court against Victor Brito Chief of Police

Hagerstown Police Department, in his official capacity; the Hagerstown Police Department; P.O.

Eichelberger; Sgt. Constable; Officer Rowe; "Officers Unknown" in both their official and personal

capacities; Bob Bruchey, Mayor of the City of Hagerstown, in his official capacity; the City of Hagerstown; and, in their official capacities, City Council Members Kristin B. Aleshire, Paul Corderman, Emily Keller, Lewis Metzner, and Donald F. Munson.

The Complaint, which seeks both equitable (injunctive) relief and money damages, arises from an encounter between B.N.S. and members of the City of Hagerstown Police Department on September 19, 2016. Essentially, B.N.S. alleges that she was illegally detained, "manhandled," and placed in handcuffs. (ECF No. 1, ¶¶ 2 and 3). In paragraphs 4 and 5 of the Complaint, B.N.S. alleges that officers "slung her face first into the side of a brick building," and pepper sprayed her after she was placed in a police car. Subsequently, B.N.S.'s father picked her up at the police station and took her to a nearby hospital where she allegedly was treated for "chemical burns." (ECF No. 1, ¶ 5).

As to her specific claims, B.N.S., in paragraph 6 of the Complaint, alleges under the auspices of 42 U.S.C. § 1983 violations of the Fourth and Fourteenth Amendments of the federal constitution, and, under state law, a violation of Article 24 of the Maryland Declaration of Rights. She also identifies common law claims of false arrest and intentional infliction of emotional distress. As to specific counts, there are five: Count I (42 U.S.C. §1983-Excessive Force); Count II (42 U.S.C. §1983-Unlawful Seizure-Fourteenth Amendment); Count III (42 U.S.C. §1983-False Arrest and Emotional Distress Resulting from False Arrest); Count IV (42 U.S.C. §1983-Intentional Infliction of Emotional Distress); and Count V (42 U.S.C. §1983-Fourteenth Amendment-*Monell* Claim).

Summonses were issued and served. Defendants sought and obtained an extension of time through and including December 21, 2017 in which to respond to the Complaint. Defendants now move to dismiss or, alternatively, for summary judgment.

## II.    Motions to Dismiss and for Summary Judgment

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. A complaint need only contain " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff. However, conclusory statements or "a formulaic recitation of the elements of a cause of action will not [suffice]." *Twombly*, 550 U.S. at 555. A complaint must allege sufficient facts "to cross 'the line between possibility and plausibility of entitlement to relief.' " *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, at 557). Inquiry into whether a complaint states a plausible claim is " 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Francis,* 588 F.3d at 193 (quoting *Twombly*, at 557). Thus, if "the well-pleaded facts [contained within a complaint] do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' " *Francis,* at 193 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (alteration in original)).

When "matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *Laughlin v. Metro. Washington Airports Auth*., 149 F.3d 253, 260– 61 (4th Cir. 1998). Because the Court has relied upon supplemental affidavits and documents filed outside of the pleadings, it will treat the pending motion as a motion for summary judgment. A motion for summary judgment shall be granted if the pleadings and supporting documents "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled into a simple statement: The Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically. After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991). Thus, to defeat a motion for summary judgment, "the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her." *Mackey v. Shalala*, 43 F. Supp. 2d 559, 564 (D. Md. 1999).

### III. Material Facts Not Genuinely In Dispute

On September 18, 2016, at approximately 2:34 p.m., Officer Zachary Rowe and Andrew Eichelberger of the City of Hagerstown Police Department were on routine patrol when they received a dispatch for a personal injury accident involving an individual on a bicycle or motorcycle being struck at the intersection of Randolph Avenue and North Locust Street in Hagerstown. (Exhibits 1-3). Officer Eichelberger was Officer Rowe's Field Training Officer and they were in Officer Eichelberger's patrol car. (Exhibits 1-2). The Officers were in full uniform and in a marked police vehicle. (Exhibits 1-3). Within minutes, the Officers arrived at the intersection. (Exhibits 1-3). Multiple Fire Department and emergency medical personnel were already on the scene. (Exhibits 1-3).

Upon his arrival, Officer Eichelberger spoke with Wilson Augustus Shearer, who identified himself as the driver of the car involved in the collision. (Exhibits 1 and 3). He said that he had been driving north on Locust Street, approaching Randolph Avenue, immediately prior to the accident. (Exhibits 1 and 3). He entered the intersection with the green light, and, as he did so, a young female,

riding her bike down the hill on Randolph Avenue, entered the intersection, and struck the side of his car. (Exhibits 1 and 3). The female was knocked from her bike to the ground. (Exhibits 1 and 3). The driver pointed out the damage to his car to Officer Eichelberger, which included the side view mirror being knocked inward and a long scrape on the driver's side of the car. (Exhibits 1 and 3). Mr. Shearer stated that he had immediately stopped, used OnStar to contact 911, and got out of his car. (Exhibits 1 and 3). After exiting his car, he saw that the female was now off the ground and mounting her bike as if to ride away. (Exhibits 1 and 3). Mr. Shearer and others at the scene then persuaded the juvenile to stay until emergency medical personnel arrived. (Exhibits 1 and 3). After he finished speaking with Mr. Shearer, Officer Eichelberger asked him to move his car to the curb so as not to obstruct traffic. (Exhibits 1 and 3). Officer Eichelberger then walked over to where Officer Rowe was standing with the juvenile. (Exhibits 1 and 3).

When Officer Rowe arrived at the location, he spoke with Hagerstown Fire Department personnel. (Exhibit 2). They informed him that a child, believed to be approximately twelve years old, had been struck by a moving car while riding her bike. (Exhibit 2). She had been knocked from the bike and struck the pavement. (Exhibit 2). The emergency personnel told Officer Rowe that the juvenile was refusing medical treatment and would not allow herself to be examined.[1] (Exhibit 2). Officer Rowe walked over the juvenile and asked her if she was okay. (Exhibit 2). The juvenile said that she was "fine," but, when the officer asked for her name, she refused to provide it. (Exhibit 2). She stated that she had collided with a moving car while riding her bike, but that she did not need medical treatment. (Exhibit 2). Officer Rowe advised the juvenile that he could not allow her to decline medical

---

[1] Emergency medical treatment for minors is governed by §20-102 of the Health-General Article. Generally, a minor has the same capacity as an adult to consent to medical treatment, if, in the judgment of the attending physician, the life or health of the minor would be affected adversely by delaying treatment to obtain the consent of another individual. In the instant case, the emergency medical personnel were unable to make any medical assessment of B.N.S. due to her refusal to be examined.

treatment without the presence of a parent or guardian and asked for their names. (Exhibit 2). The juvenile refused to provide any information and continued to refuse to allow emergency medical personnel to examine her. (Exhibit 2). Instead, she became more and more agitated, using profanity in her interaction first with Officer Rowe, and then Officer Eichelberger when he walked over. (Exhibits 1-3). She virtually ignored the Officers, mounted her bike, and attempted to ride off. (Exhibits 1-3). Officer Rowe and Officer Eichelberger physically prevented her from leaving. (Exhibits 1-3). She was repeatedly told that she could not leave and that she was being formally detained at the scene of the accident. (Exhibits 1-3). In response, the juvenile became more profane and physically resisted all efforts to detain her. (Exhibits 1-3).

The Officers repeatedly told her that she could not leave; that she was being detained; that she needed to be screened by medical personnel; and that a parent or guardian needed to come to the location. (Exhibits 1-3). The juvenile, however, steadfastly refused to provide any information, attempting to dictate the course of events on her terms. (Exhibits 1-3). She physically lashed out at the Officers and tried to get away from them. (Exhibits 1-3). It was at this point that they decided to place the juvenile in handcuffs and seat her on the curb. (Exhibits 1-3). The juvenile, however, refused to let this happen. (Exhibits 1-3). She continued her shrill and profane tirade and tried to trip and kick the Officers. (Exhibits 1-3). She simply would not allow them to get her hands behind her back and continued to kick and fight. (Exhibits 1-3). In split seconds, the Officers pushed the juvenile into the side of the adjacent building and grabbed her hands at the same time. (Exhibits 1-3). They quickly handcuffed her and got her into a sitting position. (Exhibits 1-3). During these events, the Officers were dealing with other individuals who attempted to intercede, and who were making derogatory statements about the police. (Exhibits 1-3). As the situation escalated, Officer Eichelberger requested that other

officers be sent to the location, and ultimately requested the presence of his supervisor, Sergeant Casey Constable.  (Exhibits 1-3).

When Sergeant Constable arrived, the juvenile was very emotional and sitting on the curb. (Exhibits 1-4).  She told him that she did not want to go to the hospital and wanted to leave.  (Exhibits 3-4).  Sergeant Constable explained that she was not free to leave because of her juvenile status, and asked that she have her mother respond so that her mother could refuse medical treatment on her behalf. (Exhibits 3-4).  The juvenile continued with her profanity, stating that she was already in trouble, and that her mother was watching a football game.  (Exhibits 3-4).  She still would not give her name, her mother's name, her phone number or her address.  (Exhibits 3-4).  Since people were being drawn to the location by the disturbance, Sergeant Constable directed Officers Eichelberger and Rowe to place the juvenile in a patrol car so that the Officers could take her home.  (Exhibits 1-4).  At the point when the Officers began to move the juvenile to the car, she had handed her cell phone to a man standing nearby. (Exhibits 1-4).  Immediately thereafter, and as if on cue, the juvenile, launched into another shrill, profane tirade.  However, she would not walk, and instead went limp, requiring the Officers to carry her by her arms and legs.  (Exhibits 1-4).  She yelled, fought and kicked every step of the way.  (Exhibits 1-4).

At some point early in the events, the juvenile kicked Officer Rowe with such force that his body camera was dislodged and fell to the ground.  (Exhibit 2).  The camera was found but no footage was recovered.  (Exhibit 2).  As the Officers carried the juvenile toward the patrol, she kicked Officer Eichelberger in the chest, deactivating his body camera.  (Exhibits 1-4).  Officer Dustin Vogel arrived at the scene about this time.  (Exhibits 1-2 and 4-5).  Sergeant Constable opened the car door and Officers Rowe and Eichelberger attempted to seat the juvenile in the rear seat. (Exhibits 1-2 and 4-5).   She would have none of it, physically resisting the entire effort and continuing with loud profane outbursts.

(Exhibits 1-2 and 4-5). She continued to pull, thrash, and kick, even after being placed in the car. (Exhibits 1-2 and 4-5). Her next move was to kick the door and place her feet against it to prevent it from being closed. (Exhibits 1-2 and 4-5). The Officers repeatedly told her to place her legs and feet in the car, but every directive was ignored. (Exhibits 1-2 and 4-5). Sergeant Constable implored that he simply wanted to take her home, but the juvenile still refused any cooperation. (Exhibits 1-2 and 4-5). Instead, she screamed "I hope you die!" in the officer's face. (Exhibits 4-5).

With the juvenile still preventing the door from closing with her feet, she was repeatedly warned that, if she did not stop she would be pepper sprayed. (Exhibits 1-2 and 4-5). In fact, Officer Vogel would insert his pepper spray canister through the partially open rear window as if to spray, but did not. (Exhibit 5). He did this on at least two occasions, but the juvenile never stopped resisting. (Exhibit 5). Instead, she would lower her head and turn away as if to avoid any spray. (Exhibit 5). Eventually, Officer Vogel deployed a very short, three second burst of pepper spray into the back seat of the car. (Exhibit 5). The juvenile's head was lowered towards her knees and her face was turned away as he did this. (Exhibit 5). The body camera footage captures the three second burst, the only time any chemical device was used. (Exhibit 5). At this point, the still unidentified juvenile was unquestionably under arrest, and, the Officers transported her to the station for decontamination and processing. (Exhibit 1-2 and 4-5).

Upon arrival at the Police Station, Officer Eichelberger attempted to remove the juvenile from the back seat. (Exhibits 1-2). As he did so, she kicked him in the groin. (Exhibits 1-2). The Officers were able to get the juvenile into the station despite her resistance. (Exhibits 1-2 and 6). They took her down the stairs to the processing area. (Exhibit 1-2 and 6-7). Closed circuit video captures her entry into the station and her being escorted to the processing area. (Exhibits 6-8). The still unidentified juvenile was placed on the bench and a female officer conducted a cursory search of her person.

(Exhibit 8).  Her backpack was also searched.  (Exhibits 2 and 8).  Her handcuffs were removed and, after being instructed in decontamination, she was given water and paper towels to flush and wipe her eyes.  (Exhibits 1-2, 4 and 8).  She was allowed to use the rest room on two occasions to flush and wipe her eyes.  (Exhibits 1-2, 4 and 8).  She had no visible injuries, and apart from the sting of pepper spray, made no complaints of pain or injury.  (Exhibit 1-2 and 4).

As the situation was now calm, the Officers asked again, and now obtained the juvenile's name, B.N.S., and her address.  (Exhibits 1-2 and 4).  She also gave her mother's contact information. (Exhibits 1-2 and 4).  When Officer Rowe examined the contents of B.N.S.'s backpack, he discovered a small plastic baggie containing suspected marijuana.  (Exhibits 2 and 8).  After several more minutes passed, B.N.S. was released to the custody of her mother.  (Exhibits 1-2, 4, and 8).

Sergeant Constable met Christina Stuart at the station, and explained that her daughter was being processed for juvenile charges.  (Exhibits 4 and 10).  Ms. Stuart said that she wanted a lawyer to be present because the Officers weren't allowed to question her daughter.  (Exhibit 4).  Sergeant Constable explained that the Officers had tried to obtain only basic contact information and that her daughter was not being interrogated.  (Exhibit 4).  Ms. Stuart told Sergeant Constable that he was wrong and that she wanted a lawyer present.  (Exhibit 4).  Sergeant Constable explained that she could contact a lawyer but it was unnecessary because the juvenile's processing would be finished long before anyone could arrive. (Exhibit 4).  The discussion escalated to the point where Ms. Stuart was screaming about what the Officers had done.  (Exhibit 4).  When B.N.S. was finished with processing, the Officers escorted her upstairs where she met her mother.  (Exhibits 4 and 10).  Ms. Stuart's son, who was also present, said something to the effect of, "This is why no one likes you pigs.  Fuck you guys."  (Exhibit 4).  He tried to push past his mother to reach the Officers, but she blocked him and pushed him towards their car. (Exhibits 4 and 10).  The Stuarts then left.  (Exhibits 4 and 10).

B.N.S. was charged as a juvenile with disorderly conduct, two counts of second degree assault, and possession of CDS (marijuana). (Exhibit 10). She was also charged with failure to obey a traffic control device in violation of §21-201(a)(1) of the Transportation Article. (Exhibit 10).

## IV.    Argument

### A.    Motion to Dismiss-State Law

#### 1.    The Absence of Legal Identity

As a threshold issue, B.N.S. names the Hagerstown Police Department as a defendant in this action. The department lacks legal identity, and thus is not capable of being sued. Under Maryland law, local police departments are agents of the municipality they serve and are not treated as separate legal entities. *See Hines v. French*, 157 Md. App. 536, 573 (2004) (citation omitted); *see also Taylor v. Leggett*, 2017 U.S. Dist. LEXIS 36972, at *6, 2017 WL 1001281 (D. Md. Mar. 15, 2017). As such, any claims made against the Hagerstown Police Department are, in effect, claims against the City of Hagerstown and naming the Hagerstown Police Department as a separate defendant is improper. *See Hines*, 157 Md. App. at 573.

#### 2.    Governmental Immunity

Gleaning from the Complaint the common law torts of false arrest and intentional infliction of emotional distress, the City asserts that it is governmentally immune from these non-constitutional torts. In Maryland, counties and municipalities, as instrumentalities of the State, are immune from suit on common law, non-constitutional torts that stem from the exercise of a governmental, rather than proprietary, function. *Board of Educ. of Prince George's County v. Town of Riverdale*, 320 Md. 384, 389 (1990). A function is governmental if it is "performed ... for the common good of all" rather than "for the special benefit or profit" of the local government. *Tadjer v. Montgomery County*, 300 Md. 539, 547 (1984). The "exercise of the police power to promote the safety, health, and welfare of the public"

is a quintessential government function. *E. Eyring and Sons Co. v. City of Baltimore*, 253 Md. 380, 885 (1969); *see also Port Deposit v. Petetit*, 113 Md. App. 401, 420 (1997) (holding that acts taken by a Chief of Police pursuant to his law enforcement authority were "clearly" an exercise of a government function). Here, B.N.S. has sued the City based on her detention and arrest, acts that plainly fall within the scope of the police power. Because B.N.S.'s state common law, non-constitutional tort claims against the City arise from the City's exercise of a government function, the City is immune from suit on those claims.

### 3.    In *Pari Materia*

As is more fully developed below, it is Defendants' contention that B.N.S.'s state constitutional is more rightfully pled under Article 26 of the Declaration of Rights as opposed to Article 24. Maryland courts recognize that Article 24 protects an individual's right to substantive due process, *Powell v. Md. Dep't of Health*, 455 Md. 520, 548 (2017), and Article 24 is construed in *pari materia* with the Fourteenth Amendment's Due Process Clause of the federal constitution. *Doe v. Dep't of Pub. Safety and Corr. Servs*., 185 Md. App. 625, 636 (2009). Article 26 is the Maryland state law analogue to the federal constitution's Fourth Amendment and is concerned with warrants, searches, and seizures. *See Bass v. Maryland*, 182 Md. 496, 501 (1943). Maryland courts "have long recognized that Article 26 is in *pari materia* with the Fourth Amendment." *Ross v. Early*, 899 F. Supp. 2d 415, 431 (D. Md. 2012) (quoting *Dent v. Montgomery County Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010)); *see also Richardson v. McGriff*, 361 Md. 437, 452-53 (2000). In the event B.N.S's claims under the Fourth Amendment fail, her state constitutional counterpart must fail as well.

### 4.    The Insufficiency of the Intentional Infliction Claim

A claim of IIED has four elements: (1) intentional or reckless conduct that is (2) extreme and outrageous and is (3) causally connected to the emotional distress, which is (4) severe. *Manikhi v. Mass*

*Transit Admin*., 360 Md. 333, 367 (2000). This is not an easy claim to establish. The Maryland Court of Appeals addressed the second element in *Harris v. Jones*, 281 Md. 560 (1977):

> "Whether the conduct of a defendant has been "extreme and outrageous," so as to satisfy that element of the tort, has been a particularly troublesome question. Section 46 of the Restatement [ (Second) of Torts, ch. 2, Emotional Distress (1965) ], comment d, states that "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Harris,* 281 Md. at 567.

The tort of IIED "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct ... of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670 (1992). "[L]iability for the tort of intentional infliction of emotional distress should be imposed sparingly, and its balm reserved for those wounds that are truly severe and incapable of healing themselves." *Caldor Inc. v. Bowden*, 330 Md. 632, 642 (1993) (internal quotation marks omitted). "The fourth element of the tort 'requires the plaintiff to show that he suffered a severely disabling emotional response to the defendant's conduct.' " *Caldor,* 330 Md. at 643 (quoting *Harris,* at 570).

Here, this action is essentially one of police misconduct, arising from alleged wrongful detention and arrest, and the use of excessive force. The federal courts are inundated with such lawsuits and there is nothing unusual about this one with the exception that it plays out on police body cameras. Even assuming Plaintiff has pleaded sufficient factual matter as to the first three elements of IIED, she has failed to sufficiently plead as to the fourth. In this regard, B.N.S.'s conclusory allegations of emotional distress and related ailments, including missing a week of school, are routinely rejected by Maryland courts for purposes of IIED claims. *See. e.g., Templeton v. First Tenn. Bank N.A.*, No. CIV.WDQ-09-3280, 2010 WL 2292493, at *5 (D. Md. June 3, 2010), *aff'd in part, vacated in part on other grounds*,

424 Fed.Appx. 249 (4th Cir. 2011)(finding allegations that plaintiff suffered "severe mental anxiety" and "extreme emotional distress for which she incurred medical costs" were insufficient to constitute severe distress); *Griffin v. Clark*, No. RWT 11-2461, 2012 WL 4341677, at *3 (D. Md. Sept. 20, 2012)(dismissing IIED claim and noting that "Maryland courts have found that mere embarrassment, public humiliation, feelings of inferiority, or shame do not rise to the level of severe emotional distress."); *Takacs v. Fiore*, 473 F. Supp. 2d 647, 652 (D. Md. 2007) (dismissing IIED claim where plaintiff did "not allege that she has been unable to function on a daily basis, even if her functioning is presumably affected by her psychological and physical distress.").

Here, B.N.S., despite allegedly missing school, crying in a convenience store, and developing "fears and phobias," seemingly has managed to get on with her life. There simply is no allegation to the contrary. And, the allegation referring to "concussion protocol" is not surprising since, by her own allegation, B.N.S. was knocked to the street by a moving car and "was knocked unconscious for a few minutes." (ECF No. 1, ¶ 23). There is, however, no allegation that she has required psychological treatment, was hospitalized for an emotional condition, or that she is no longer able to continue in high school or whatever work she might do. For this reason, this run of the mill IIED claim must be dismissed.

### B.     Motion to Dismiss-Federal Law

#### 1.     John Doe Defendants and Lack of Personal Jurisdiction

It is Defendants' contention that any issue concerning "John Doe" defendants can be ignored at this juncture pending identification and service of process. The information included in the Complaint is simply insufficient to conduct any further inquiry or require response. When "John Doe" defendants, who presumably are City of Hagerstown Police Officers, are identified and served, they will have the opportunity to raise all defenses.

## 2.     The Official Capacity Claims

B.N.S. has sued multiple defendants, including the mayor, police chief, and council members, in their official capacities.  There is a vital distinction between § 1983 claims against a public official in his or her individual capacity and such claims against him or her in their official capacity.  "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  "Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Graham,* 473 U.S. at 165 (internal quotation marks omitted).  For the former claims, a plaintiff must show that the official acting under color of state law caused the deprivation of a federal right; for the latter type of claim, however, a governmental entity is only liable if a policy or custom of that entity played a part in the violation of federal law.  *Graham,* at 166.  Since B.N.S. has sued the City under §1983, her claims against defendants in their official capacities are redundant and must be dismissed.

## 3.     The *Monell* Claim

Although Count V of B.N.S.'s Complaint purports to plead a claim of municipality liability under 42 U.S.C. §1983, it fails to do so.  To state a § 1983 claim against a municipality, a plaintiff must allege that the action at issue was one that "execute[s] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or that represents informal governmental "custom."  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).  Local governments cannot be held liable under § 1983 for injuries inflicted by their employees or agents based on the theory of *respondeat superior* – that is, "for an injury inflicted solely by its employees or agents."  *Monell,* 436 U.S. at 694; *see Austin v. Paramount Parks, Inc*., 195 F.3d 715, 727–28 (4th Cir. 1999).  "Section 1983 plaintiffs seeking to impose liability on a municipality must,

therefore, adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994); *see Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

The United States Court of Appeals for the Fourth Circuit has cautioned that while "the substantive requirements for proof of municipal liability are stringent," "[§] 1983 claims are not subject to a heightened pleading standard paralleling the rigors of proof demanded on the merits." *Jordan*, 15 F.3d at 338 (citations and internal quotation marks omitted). Instead, "a § 1983 plaintiff seeking to impose municipal liability must satisfy only the usual requirements of notice pleading specified by the Federal Rules." *Jordan,* at 339; *see Harrison v. McNeill*, No. CCB–07–3399, 2008 WL 2074146, at *3 n.1 (D.Md. May 9, 2008). Consequently, although *Monell* does not impose heightened pleading requirements above the basic "short and plain statement" requirement of Rule 8(a), plaintiffs still must adequately allege a municipal policy or custom that proximately caused the deprivation of their rights. *Jordan,* at 338; *see Peters v. City of Mount Rainier*, No. GJH-14-00955, 2014 WL 4855032, at *4 (D.Md. Sept. 29, 2014).

Here, the combination of general allegations and the virtual absence of allegations concerning any other incident or incidents demonstrates that B.N.S.'s claim rests on the alleged conduct of the Officers in this instance, nothing more, nothing less. The mere recitation of language from *Monell* in the absence of any recitation of facts is simply not enough to survive a Rule 12(b)(6) motion. The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high, but the recitation must be present. *See Iqbal,* 556 U.S. at 678*; Twomb*ly, 550 U.S. at 570. A plaintiff fails to state a claim only when, as here, she offers "labels and conclusions" or formulaically recites the

elements of his § 1983 cause of action.  *Iqbal*, at 678.  In sum, B.N.S.'s failure to plead facts plausibly alleging that the City has a custom, policy, or practice is fatal to her *Monell* claim.

### C.     Motion to Dismiss-State and Federal Law

#### 1.     Punitive Damages

Although B.N.S. seeks punitive damages against all defendants, such damages are not recoverable against the City under State or federal law.  Maryland, by statute, specifically disallows any such assessment of punitive damages against a local government.  *See, e.g*., *Robles v. Prince George's County*, 302 F.3d 262, 273 (4th Cir. 2002)(citing MD. CODE ANN., CTS. & JUD. PROC. § 5–303(c)(1)); *see also City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)(finding municipalities immune from punitive damages under § 1983).  Since punitive damages are not available against the City under § 1983 or State law, such requested relief must and should be refused.

### D.     Summary Judgment

#### 1.     The Absence of Fourth Amendment Violation

As a threshold issue, B.N.S.'s personal capacity claims under § 1983 must be analyzed under the Fourth, not the Fourteenth Amendment.  B.N.S.'s claims under § 1983 are essentially unlawful detention and arrest claims.  The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. Amend. IV.  A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."  *Bixler v. Harris*, No. CIV. WDQ-12-1650, 2013 WL 2422892, at *5 (D. Md. June 3, 2013) (citing *Brower v. County. of Inyo*, 489 U.S. 593, 597 (1989)).  Thus, "[o]nce the single act of detaining an individual has been accomplished, the [Fourteenth] Amendment ceases to apply."  *Id*.  Further, the Fourth Amendment governs all claims of excessive force arising in connection with a detention or arrest.  This Court has said: "Claims brought

under 42 U.S.C. § 1983, alleging the use of excessive force in effectuating an arrest or other seizure, are governed by the Fourth Amendment's prohibition against "unreasonable" seizures. *Jones v. Chapman,* ELH-14-2627, 2017 WL 2472220 at *26; *Graham v. Connor*, 490 U.S. 386, 395 (1989). As such, B.N.S.'s claims under 42 U.S.C. § 1983 must be analyzed under the Fourth Amendment's objective reasonableness standard and not the Fourteenth Amendment's due process standard.

### a.    The Reasonableness of the Detention

### 1.    The Vehicle Laws

The reasonable of B.N.S.'s initial detention cannot be seriously challenged. It is undisputed that B.N.S., a minor, was involved in a motor vehicle accident on a public highway on the date in question. By her own allegation, she collided with a moving car, was knocked to the ground, and rendered unconscious. Officers Rowe and Eichelberger were dispatched to the scene to investigate that accident.

Under Maryland Vehicle Law, the driver of each vehicle involved in an accident that results in bodily injury to another person immediately shall stop, return to and remain at the scene of the accident until all statutory requirements are met. MD. CODE ANN., TRANS. § 20-102(a)(1) and (2). Under § 20-104 of the Transportation Article, the driver of each vehicle involved in an accident that results in bodily injury or death of any person or in damage to an attended vehicle or other attended property "shall render reasonable assistance to any person injured in the accident, and, if the person requests medical treatment or it is apparent that medical treatment is necessary, arrange for the transportation of the person to a physician, surgeon, or hospital for medical treatment." Subsection (b)(1) and (2) of § 20-104 of the Transportation Article requires the driver of each vehicle involved in a personal injury or property damage accident to "give his name, his address, and the registration number of the vehicle he is driving, and, on request, exhibit his license to drive, if it is available, to any person injured in the accident and the driver, occupant of, or person attending any vehicle or other property damaged in the accident. By

implication, subsection (d) of § 20-104 of the Transportation Article designates police officers as the primary persons to receive the required information.  Police officers who investigate traffic accidents are required to prepare accident reports which are filed with the Department of State Police.  MD. CODE ANN., TRANS. § 20-107(f)(1).

The Maryland Vehicle Law further provides that its vehicle laws govern the driving of vehicles on public roadways and highways, as did the instant accident.  MD. CODE ANN., TRANS. § 21-101.1(a).  And, persons are prohibited by law from doing any act or failing to do any act required by the vehicle laws.  MD. CODE ANN., TRANS. § 21-102.  In this regard, Maryland law compels persons to obey police officers who issue lawful orders or directions in enforcing Maryland vehicle laws.  MD. CODE ANN., TRANS. § 21-103(a).

Critically here, the Maryland Vehicle Law applies to bicycles.  MD. CODE ANN., TRANS. §§21-1201-1205.1.

### 2.        The Authority of the Police to Arrest

Equally critical here, any person who commits a violation of the Maryland Vehicle Law "is guilty of the violation."  MD. CODE ANN., TRANS. § 26-101(a).  Pursuant to § 26-201(a)(1) of the Transportation Article, "[a] police officer may charge a person with a violation of [The Maryland Vehicle Law] if the officer has probable cause to believe that the person has committed or is committing the violation…."  A police officer who charges a person under § 26-201 shall issue a citation which the recipient must comply with within thirty (30) days.  MD. CODE ANN., TRANS. § 26-201(b) and (c).  Receipt of the citation shall be acknowledged in writing and the failure to do so may subject the person to arrest.  MD. CODE ANN., TRANS. § 26-201(c)(8)(ii).

In Maryland, a police officer is empowered to arrest without a warrant a person for violation of the Maryland Vehicle Law, including any rule or regulation adopted under it, if the violation is

18

committed within the officer's view or presence and the person either: (1) fails to furnish satisfactory evidence of identity, or (2) the officer has reasonable grounds to believe the person will disregard a traffic citation. MD. CODE ANN., TRANS. § 26-202(a)(2)(i) and (ii). Further, a police officer may arrest without a warrant a person for any violation of the Maryland Vehicle Law if the officer has probable cause to believe that the person has committed the violation, and the violation is one for, *inter alia*, failing to stop, give information, or render reasonable assistance, as required by §§20-102-105 of the Transportation Article, in the event of an accident resulting in bodily injury to or death of any person, and/or any offense that caused or contributed to an accident resulting in bodily injury to or death of any person. MD. CODE ANN., TRANS. § 26-202(a)(3)(iii)-(vi). A police officer is also empowered to arrest any person who refuses to acknowledge the receipt of a traffic citation as required by law. MD. CODE ANN., TRANS. § 26-202(a)(5). Arrests under the Maryland Vehicle Law "shall be made in the same manner as, and without more force than, in misdemeanor cases." MD. CODE ANN., TRANS. § 26-202(b).

Section 2-202(a) of the Criminal Procedure Article empowers police officers to arrest without a warrant a person who commits or attempts to commit a felony or misdemeanor in the presence or within view of the police officer. Section 2-202(b) authorizes a police officer who has probable cause to believe a felony or misdemeanor is being committed in the presence or within the view of the police officer to arrest without a warrant any person whom the police officer reasonably believes to have committed the crime.

### 3. The Detention of B.N.S.

The Officers had reasonable articulable suspicion to detain B.N.S. To determine whether reasonable articulable suspicion exists, "[t]he test is the totality of the circumstances, viewed through the eyes of a reasonable, prudent, police officer." *Sellman v. State,* 449 Md. 526, 542 (2016)(internal quotation marks omitted) (quoting *Bost v. State*, 406 Md. 341, 356 (2008)). In *Sellman*, the Court of

Appeals explained that reasonable suspicion is a common sense, nontechnical conception that considers factual and practical aspects of daily life and how reasonable and prudent people act. The Court said:

> While the level of required suspicion is less than that required by the probable cause standard, reasonable suspicion nevertheless embraces something more than an inchoate and unparticularized suspicion or hunch. Second, a court's determination of whether a law enforcement officer acted with reasonable suspicion must be based on the totality of the circumstances. Thus, the court must ... not parse out each individual circumstance for separate consideration. ... In making its assessment, the court should give due deference to the training and experience of the law enforcement officer who engaged the stop at issue. Such deference allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. To be sure, [a] factor that, by itself, may be entirely neutral and innocent, can, when viewed in combination with other circumstances, raise a legitimate suspicion in the mind of an experienced officer.

*Sellman,* 449 Md. at 543 (quoting *Crosby v. State*, 408 Md. 490, 507-08 (2009)).

Here, the initial detention of B.N.S. was not only reasonable, it was compelled by her own behavior. No person, much less a minor, who has been knocked from a bicycle by a moving car and whose head concededly struck the pavement causing loss of consciousness, has the right to either flee the scene of the accident or to defy the police officers who are charged with the duty to investigate. *See, e.g.*, *California v. Byers*, 402 U.S. 424, 434 (1971)("There is no constitutional right to … flee the scene of an accident in order to avoid the possibility of legal involvement.") Yet B.N.S. attempted to do exactly that, repeatedly and continuously, verbally and physically. The Officers explained their purpose to B.N.S. and repeatedly told her that she could not leave the scene. She could not do so for multiple reasons, including: (1) Doing so was a violation of the Maryland Vehicle Law because the Officers, at a minimum, had reasonable suspicion, to believe that the accident was one that involved personal injury; (2) Doing so was a willful failure to obey reasonable and lawful police commands; (3) B.N.S.'s persistent refusal to identify herself or a parent or guardian made it not only unreasonable, but virtually unacceptable, for the Officers to allow a the juvenile to leave under such circumstances; (4) As a minor,

B.N.S. had no ability to refuse emergency medical care at the scene absent the presence of a parent or guardian to approve such refusal and to take custody of her.

In condensed form, while the violation of the Maryland Vehicle Law typically does not lead to the offender's arrest, nevertheless, such an arrest is justified under the Fourth Amendment. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (concluding that Fourth Amendment was not violated by arrest of motorist for seatbelt violation, a misdemeanor punishable only by a fine); *see also Virginia v. Moore*, 553 U.S. 164, 176 (2008). ("[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and ... while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."); *Pegg v. Herrnberger*, 845 F.3d 112, 118 (4th Cir. 2017) (same).

B.N.S. violated multiple traffic laws in the presence of the Defendants. Thus, they had a legal justification to stop B.N.S. from leaving the scene. The use of force to detain B.N.S. also does not run afoul of the Fourth Amendment. B.N.S. was not detained simply so the Officers could investigate a minor traffic matter. Again, B.N.S. had been involved in an accident in which she had collided with a moving car and was knocked to the pavement. She admittedly suffered a concussion. Her refusal of medical care, her refusal to provide any identifying information, and her attempt to leave the scene were serious matters that required immediate police response. That physical force had to be employed was a situation of B.N.S.'s making and did not immediately convert her detention into an arrest.

The use of force can constitute an investigative detention, and not an arrest, in "special circumstances." *Longshore v. State*, 399 Md. 486, 514 (2007). Use of force will not necessarily rise to the level of an arrest if police have reasonable suspicion to believe that the suspect poses a risk to officer

safety or poses a flight risk. *Longshore,* 399 Md. at 509, 514–15. *See also Terry v. Ohio*, 392 U.S. 1, 24, 27 (1968)(permitting the use of a frisk where an officer reasonably believes that a person subject to an investigatory stop is armed and dangerous); *In re David S.*, 367 Md. 523, 539 (2002) (permitting officers to draw guns and order suspects to the ground where police reasonably believe that crime had been committed and suspect was armed with a gun).

Here, the Officers repeatedly told B.N.S. to stay and formally and physically detained her when she refused lawful police directives. Handcuffs were used because B.N.S. obviously posed a risk to officer safety and was a flight risk. That B.N.S. resisted the Officers at every step of the way resulted in her being grabbed, handcuffed, sat on the curb, and, ultimately, carried to the police car. The special circumstances presented here required the use of force to detain and maintain control of B.N.S.

Even apart from reasonable suspicion, there exists another legal justification for the initial detention of B.N.S.: The Community Caretaking Doctrine. It is accepted that the community caretaking function does not often arise in the context of involuntary, warrantless seizures of individuals, but it does occur. Here, Defendants contend that B.N.S.'s initial detention can be justified on alternative grounds by the community caretaking function. It is undisputed that B.N.S. had been struck by an automobile while riding her bike and had been knocked to the pavement. Thus, it would have been reasonable for any officer investigating the accident to detain her for medical attention and/or to release her only to a parent or guardian. This is so despite B.N.S.'s protestations that she did not want medical care and wanted to leave the scene. When B.N.S. attempted to leave and became violent with the Officers, it was more than reasonable that she be physically restrained using handcuffs. In fact, B.N.S.'s physical assaults on the Officers can be viewed in hindsight as assault upon the Officers as intervening events that attenuated any question surrounding the initial detention.

In *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), the Supreme Court first used the term "community caretaker," and validated the police impoundments of automobiles, without underlying probable cause, on the grounds that the police needed to act to protect the public from hazards and interrupted traffic. Since *Cady*, many courts have considered the breadth and scope of the community caretaking function of law enforcement officers. Some courts have construed the notion narrowly and others have given it wide berth. The so-called doctrine does not have a single meaning, but is rather an umbrella that encompasses at least three other doctrines: (1) the emergency-aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the public servant exception.

The Court of Appeals of Maryland addressed the nature and breadth of the "community caretaking doctrine" in *Wilson v. State*, 409 Md. 415 (2009). The Court did so in the context of individuals outside of the home and in need of aid. Upon reviewing precedent, the Court of Appeals concluded that it had recognized at least two categories of police activities that purportedly fell within community caretaking functions: (1) the automobile impoundment/inventory doctrine, and (2) the emergency aid doctrine. *Wilson,* 409 Md. at 431-32. The court recognized that the emergency aid doctrine and the public welfare function often overlapped. *Wilson,* at 432. The common denominator throughout all of Maryland's community caretaking cases is the initial non-criminal, non-investigatory police purpose. In *Cady*, for example, as in the instant case, the police were responding to a traffic accident rather than investigating criminal activity or seeking to implicate anyone in a crime.

The *Wilson* Court observed that law enforcement contact in the noncriminal context arises most often in two general circumstances. The first is when police approach parked cars where the driver appears to be sick or when the car appears to be functioning improperly. A second area is when law enforcement officers approach pedestrians who appear to need assistance because they appear sick, in

danger, or in need of some emergency assistance. These encounters are commonly justified only when the purpose of the police interaction is unrelated to criminal investigations.

The "public safety" doctrine is based upon a recognition that law enforcement officers perform a myriad of functions and responsibilities, the enforcement of criminal laws being only one of them. *Williams v. State*, 962 A.2d 210, 216–17 (S. Ct. Del. 2008); 3 Wayne R. LaFave, Search and Seizure, § 5.4(C) (4th ed. 2004). Siding with the majority of jurisdictions in the country, the Court of Appeals concluded that the public welfare component of the community caretaking function of the police "encompasses a non-investigative, non-criminal role to ensure the safety and welfare of our citizens," reflecting that principle that the role of the police is not limited to the investigation, detection and prevention of crime in this State. *Wilson,* at 437 (quoting *Williams,* 962 A.2d at 218); *see also State v. Lovegren*, 51 P.3d 471, 475–76 (2002).

The *Wilson* Court recognized the need to balance the need for police community caretaking with the protection of fundamental rights. In this regard, the Court adopted the following test:

> To enable a police officer to stop a citizen in order to investigate whether that person is in apparent peril, distress or in need or aid, the officer must have objective, specific and articulable facts to support his or her concern. If the citizen is in need of aid, the officer may take reasonable and appropriate steps to provide assistance or to mitigate the peril. Once the officer is assured that the citizen is no longer in need of assistance, or that the peril has been mitigated, the officer's caretaking function is complete and over. Further contact must be supported by a warrant, reasonable articulable suspicion of criminal activity, or another exception to the warrant requirement. The officer's efforts to aid the citizen must be reasonable. In assessing whether law enforcement's actions were reasonable, we consider the availability, feasibility and effectiveness of alternatives to the type of intrusion effected by the officer.

*Wilson v. State*, 409 Md. at 439.

Here, it is at least arguable that the Officers' initial contact with B.N.S. did not rise to the level of a seizure implicating the Fourth Amendment. There was no show of force or weapons, and the Officers did nothing more than make inquiries as to B.N.S.'s identity and her need for medical assistance.

Responding to a call for a traffic accident with potential personal injuries, the Officers approached B.N.S. after she was identified to them as the child on the bike. In these circumstances, the Officers had every right and responsibility to check on B.N.S.'s well-being. Only when B.N.S. attempted to leave the scene of the accident did the situation reach the constitutional threshold. B.N.S. had no constitutional right to flee or otherwise leave the scene of the accident, despite her own wishes to do so. From the moment the Officers physically restrained her, a reasonable person would have believed that she was no longer free to leave, and, consequently, the encounter between the Officers and B.N.S. rose to the level of a seizure. As is argued above, that seizure was reasonable under the Fourth Amendment.

### b. Probable Cause for the Arrest of B.N.S.

It is unquestioned that at some point in the continuum B.N.S. was under arrest. The Court of Appeals of Maryland defined in *Bouldin v. State*, 276 Md. App. 511 (1976), the parameters of a legal arrest. It held: "It is said that four elements must ordinarily coalesce to constitute a legal arrest: (1) an intent to arrest; (2) under a real or pretended authority; (3) accompanied by a seizure or detention of the person; and (4) which is understood by the person arrested..." 276 Md. 511, 515–16 (1976). In situations where there is a seizure, but no probable cause, that seizure is considered a *de facto* arrest. *See Bailey v. State*, 412 Md. 349 (2010)("If a seizure and subsequent search is not justified by reasonable, articulable suspicion that the individual is armed pursuant to *Terry*, the seizure is a *de facto* arrest and must be supported by probable cause in order to be lawful."). As such, a *de facto* arrest is highly factual and depends on the circumstances of the seizure. A *de facto* arrest occurs when "a reasonable person [would] have felt he or she was not free" to leave a situation or end an encounter. *Reid v. State*, 428 Md. 289, 299 (2012). A detention can elevate to a *de facto* arrest when a police officer acts with "actual authority and physically seizes [a person]," resulting in the person having a clear understanding that he or she is not free to leave. *Id.* at 300 (citing *Bailey v. State*, 412 Md. 349

(2010)).  There was no *de facto* arrest in the instant case.  There was an initial investigative detention based upon *Terry* and a subsequent arrest based on probable cause.

Defendants contend that probable cause for such arrest existed at the earliest stages of the interaction with B.N.S., when she physically resisted their efforts to detain her at the scene.  Although the Officers expressed an intention to merely detain B.N.S. so they could gather information, she could have been arrested based upon her actions.  An objective view of the facts establishes that Sergeant Constable's directive to move B.N.S. to the patrol car was more than reasonable under the circumstances, and that B.N.S.'s hysterical resistance, both physical and verbal, established ample basis to arrest.  Her refusal to remove her feet from the police car door only buttressed that probable cause.

Probable cause to arrest "exists where the facts and circumstances within the knowledge of the officer at the time of the arrest, or of which the officer has reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the suspect had committed or was committing a criminal offense." *Moulden v. State*, 212 Md. App. 331, 344 (2013) (quoting *Haley v. State*, 398 Md. 106, 133 (2007)).  The probable cause standard is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quotation marks and citations omitted).  It is "not reducible to precise definition or quantification." *Robinson v. State*, 451 Md. 94, 110 (2017) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).  Rather, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Pringle*, 540 U.S. at 370–71, (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).  "A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion." *Moulden*, 212 Md. App. at 344 (quoting *Haley, supra*).  In assessing "whether an officer had probable cause to arrest an

individual, courts examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Pringle*, 540 U.S. at 371 (citation omitted).

Here, it cannot be questioned that there was ample probable cause upon which to arrest B.N.S. Initially, she committed multiple violations of the Maryland Vehicle Law related to personal injury and property damage accidents when, combined with her refusal to provide identification and attempts to flee, justified immediate arrest. Her repeated refusal to obey the Officers' repeated lawful commands and her physically touching, striking, and kicking them sealed the probable cause issue.

In Maryland, a person may not commit an assault. MD. CODE ANN., CRIM. §3-203(a). Assault in the second degree prohibits a person from intentionally causing physical injury to another if the person knows that the other is a law enforcement officer engaged in the performance of the officer's official duties. MD. CODE ANN., CRIM. §3-203(c). Disorderly conduct is a misdemeanor that prohibits a person from acting willfully in a disorderly manner that disturbs the public peace. MD. CODE ANN., CRIM. §10-201(c)(3). It further prohibits a person from willfully failing to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance of the public peace. MD. CODE ANN., CRIM. §10-201(c)(3). Based on the record evidence, there was ample probable cause for the Officers to arrest B.N.S. for any or all of these offenses.

### c.    The Absence of Excessive Force

Based on B.N.S.'s extreme, violent behavior, the summary judgment evidence establishes that, when judged from the perspective of a reasonable officer on the scene, the Officers utilized objectively reasonable force to detain her and to take her into custody. It should be noted that it is clear from the videos that one of the Defendants, Sergeant Constable, used no force against B.N.S.

In *Jones v. Chapman*, ELH-14-2627, 2017 WL 2472220 (2017), this Court summarized the law governing use of force claims under 42 U.S.C. § 1983 as follows:

> Claims brought under 42 U.S.C. § 1983, alleging the use of excessive force in effectuating an arrest or other seizure, are governed by the Fourth Amendment's prohibition against "unreasonable" seizures. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Reasonableness is analyzed by weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (internal quotation marks omitted); *see also Graham*, 490 U.S. at 396 ("Determining whether the force used to effect a particular seizure is 'reasonable' " involves a balance of the individual's Fourth Amendment interests against the government's interests)…..The operative question in excessive force cases is 'whether the totality of the circumstances justifies a particular sort of search or seizure.' " *County of Los Angeles v. Mendez*, —— U.S. ——, 2017 WL 2322832, at *6 (May 30, 2017). Of relevance here, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396….
>
> To determine whether excessive force was used, the Fourth Circuit has said: "We determine whether an officer has used excessive force to effect an arrest based on a standard of 'objective reasonableness,' taking into account 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Meyers v. Baltimore County, Md.*, 713 F.3d 723, 732-33 (4th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). Courts have also considered the extent of the injury caused by the use of force in determining whether the use of that force was reasonable. *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003).

*Chapman*, 2017 WL 2472220, at *26–27.

Here, force became necessary solely because B.N.S. made it necessary. She acted out in such an extreme way that the Officers had no choice but to physically restrain and place her in handcuffs. Even thereafter, B.N.S. continued to aggressively thrash about and kick the Officers. This conduct, which began at the scene, did not end until B.N.S. was in the processing area at the station. No officer should have been subjected to the kind of behavior exhibited by B.N.S., and any officer in their place would have used the same minimal and reasonable force to stop it. The record evidence shows that the force used by Officers Eichelberger and Rowe was more than reasonable under the circumstances. This is

borne out by the fact the evidence makes it abundantly clear that B.N.S. sustained no physical injury at the hands of these Officers, as is established by the body camera recordings.

### d. The Existence of Qualified Immunity

The Officers assert the affirmative defense of qualified immunity. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell,* 652 F.3d 524, 531 (4th Cir. 2011) (en banc). While certain aspects of B.N.S.'s Fourth Amendment claims can be considered mundane, *i.e.*, the right to be free from unreasonable seizure, including the use of excessive force in the course of an arrest, other aspects of her claims implicate matters that, at least at first impression, may seem not as certain, *i.e.*, the right of a police officer to detain a juvenile or other person at the scene of a personal injury and/or property damage motor vehicle accident for investigative or medical purposes.

Under the two-step process set out by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), reviewing courts must ask "whether a constitutional violation occurred." *Henry*, 652 F.3d at 531. If the court concludes that a constitutional violation has occurred, the court then must examine "whether the right violated was clearly established." *Henry*, at 531. A right is "clearly established" when "its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cooper v. Sheehan,* 735 F.3d 153, 158 (2013) (internal alteration and quotation marks omitted).

Here, there was, and is, no clearly established law that would have prohibited the Officers from detaining B.N.S. at the scene of an accident in which she potentially had sustained a head injury. The Officers had a duty to investigate the accident and to take steps to ensure that the minor received medical treatment. Since B.N.S. was a minor, the Officers could not accept her refusal of medical care, and reasonably insisted that B.N.S. help them in having a parent or guardian respond to the scene. To

do otherwise would have been completely irresponsible and professionally unacceptable. One can simply imagine the outcry if, under different circumstances, the Officers had simply allowed B.N.S. to pedal away, only to learn thereafter that she had significant internal injuries or even became involved in another accident. The decision to stay or go was simply not B.N.S.'s to make, and no existing precedent would have alerted the Officers to the contrary.

Finally, the summary judgment evidence establishes that no constitutional violation occurred as the force used against her was reasonable under the circumstances. The evidence is in the body camera videos. The images show that B.N.S. quickly demonstrated a propensity for violence and resisted the Officers in any way she could. The record evidence in the case puts beyond genuine dispute that B.N.S., at a minimum, was physically resistant and noncompliant with lawful commands. In 2016, when B.N.S. was arrested, relevant precedent did not clearly prohibit an officer from using force in order to effectuate an arrest of a suspect who physically resists. *See Bounds v. Parsons*, 700 Fed. Appx. 217, 220 (4th Cir. 2017)(qualified immunity granted in reliance on videotape of occurrence). Stated another way, at the time of B.N.S.'s arrest, no precedent would have made clear to "every reasonable official" that they were precluded from using force to effectuate the lawful detention, and subsequent arrest of a physically resistant and noncompliant suspect. The Officers are therefore entitled to qualified immunity.

### 2.     The Absence of False Arrest

Because B.N.S.'s detention and arrest were legally justified, she cannot prove the common law tort of false arrest. Under Maryland law, "[t]he elements of the tort of false imprisonment are as follows: '1) the deprivation of the liberty of another; 2) without consent; and 3) without legal justification.' " *Chapman*, 2017 WL 2472220 at *24 (quoting *Jones v. NMS Health Care of Hyattsville*, LLC, 903 F. Supp. 2d 323, 330-31 (D. Md. 2012)). *See Heron v. Strader*, 361 Md. 258, 264 (2000).

"Any exercise of force, or threat of force, which deprives the plaintiff of his or her liberty is an imprisonment." *Chapman*, 2017 WL 2472220 at *24.

In Maryland, legal justification for a warrantless arrest for a misdemeanor requires that the "misdemeanor was actually committed in a police officer's view or presence." *Ashton v. Brown,* 329 Md. 70, 121 (1995). Thus, "probable cause is not a defense in an action for false imprisonment based upon a police officer's warrantless arrest for the commission of a non-felony offense." *Ashton,* 329 Md. at 121. Therefore, the question on the false arrest count is not one of probable cause but rather whether the undisputed facts show that the Officers had legal justification for depriving B.N.S. of her of liberty without her consent. *See Prince George's County v. Longtin*, 419 Md. 450, 506 (2011). And, on summary judgment, the issue for that count is whether, when viewing the facts "in the light most favorable to the plaintiff, a fact-finder could infer the plaintiff was not committing the charged crime." *Ross v. Early*, 899 F.Supp.2d 415, 430 (D. Md. 2012), *aff'd*, 746 F.3d 546 (4th Cir. 2014).

Here, there can be no dispute in this regard. The Officers were legally justified in effecting the arrest of B.N.S. based on her commission of multiple crimes, albeit misdemeanors, in their presence. For this reason, summary judgment must and should be granted as to B.N.S.'s false arrest claim.

**V.      Conclusion**

For these reasons, Defendants' Motion to Dismiss or, alternatively, for Summary Judgment must and should be granted.

_____/s/_____
John F. Breads, Jr.
Federal Bar No. 01343
jbreads@lgit.org

_____/s/_____
Matthew D. Peter
Federal Bar No. 26351
mpeter@1git.org
7225 Parkway Drive
Hanover, Maryland 21076
Office 443-561-1700
Facsimile 443-561-1701

(Counsel for Defendants)

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of December 2017, a copy of the foregoing

Memorandum in Support of Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment,

was filed electronically and served electronically upon counsel of record.

_____/s/_____
Matthew D. Peter